J-A29021-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: N.R., A MINOR | : IN THE SUPERIOR COURT OF : PENNSYLVANIA : : : : APPEAL OF: M.M., FATHER : : : : : : No. 695 WDA 2024 |

Appeal from the Order Entered April 30, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000168-2023

| | |
|---|---|
| IN THE INTEREST OF: N.R., A MINOR | : IN THE SUPERIOR COURT OF : PENNSYLVANIA : : : : APPEAL OF: M.M., FATHER : : : : : : No. 696 WDA 2024 |

Appeal from the Order Entered April 30, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000166-2023

| | |
|---|---|
| IN THE INTEREST OF: N.R., A MINOR | : IN THE SUPERIOR COURT OF : PENNSYLVANIA : : : : APPEAL OF: M.M., FATHER : : : : : : No. 697 WDA 2024 |

Appeal from the Order Entered April 30, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000167-2023

BEFORE:  OLSON, J., LANE, J., and BENDER, P.J.E.

J-A29021-24

M.M. ("Father") appeals from the April 30, 2024 orders that involuntarily terminated his parental rights to his two daughters, Ny.R. and Na.R., and son, Ne.R., who are triplets born in December 2021 (collectively, "the Children").[1] We affirm.

The certified record reveals the following relevant factual and procedural history.  In December 2021, the Allegheny County Office of Children, Youth, and Families ("CYF") received a report that Mother and the Children had tested positive for cocaine after a premature birth at just 30 weeks gestation.  *See* N.T., 4/29/24, at 73.  CYF caseworker Sarah Rybicki investigated the report and testified that Mother admitted to using cocaine twice a week throughout her pregnancy.  *See id*.  Mother informed Ms. Rybicki that the Children's biological father was either her former paramour, L.P., or Father.  *See id*. at 76.

The Children remained hospitalized in the neonatal intensive care unit ("NICU") until late January 2022.  Upon their discharge, the Children were still suffering from, *inter alia*, swallowing and feeding issues.  *See* Order of Adjudication, 2/15/22.  As a result of their premature birth, Ms. Rybicki

---

[1] On the same date, the court also terminated the parental rights of the Children's Mother, C.R. ("Mother") (collectively with Father, "Parents"). Mother did not appeal.

- 2 -

reported that the Children require multiple special services, including physical, occupational, and developmental therapies.[2] **See** N.T., 4/29/24, at 82, 103. Further, the record indicates that Na.R. is diagnosed with autism. **See id**. at 17, 103.

On January 14, 2022, the juvenile court awarded CYF emergency custody of the Children. The same day, CYF informed Father that Mother had identified him as the Children's father. **See id**. at 76. Father denied his paternity of the Children, and he stated that he wanted nothing to do with them.[3] **See id**. Nevertheless, on January 17, 2022, Ms. Rybicki informed Father, via text message, that a shelter care hearing was scheduled for the following day, and that he was permitted to attend by telephone. Father did not respond to the communication, and he did not attend the hearing that resulted in the Children being placed in shelter care. **See id**. at 77.

Likewise, Father did not attend the Children's dependency hearing on February 15, 2022, following which the court adjudicated the Children dependent and placed them in the kinship home of Mother's cousin, R.M ("the

---

[2] Specific details regarding the Children's continued special needs are absent from the certified record.

[3] Father told Ms. Rybicki that he was married and resided with his wife. Further, the record reveals that Father has five natural children. **See** N.T., 4/29/24, at 76. Father testified that, at the time of the subject proceeding, two of them resided full-time in his custody. **See id**. at 245-247. As best we can discern from the record, Father shares custody of the other three children with their mother. **See id**. at 218, 244.

kinship mother"), where they have remained. **See** Order of Adjudication, 2/15/22; **see also** N.T., 4/29/24, at 79. Father did not attend the adjudication hearing.

The Children's permanency goal was established as reunification with their natural parents. To that end, the court also ordered paternity testing of L.P. and Father. **See** Order of Adjudication, 2/15/22. L.P. acquiesced to the testing, which revealed he was not the Children's biological father. **See** N.T., 4/29/24, at 77. Upon learning the results of L.P.'s test, Father agreed to obtain a paternity test, which confirmed his parentage in October 2022, when the Children were approximately ten months old. **See id**. at 77-78, 257.

Thereafter, in furtherance of reunification with the Children, who were then eleven months old, the court ordered Father to: (1) complete a parenting course; (2) attend supervised visitation with the Children; (3) attend Children's medical and therapeutic appointments; (4) participate in mental health treatment; (5) maintain his sobriety; (6) acquire appropriate housing; and (7) engage in intimate partner violence ("IPV") counseling. **See id**. at 81.

With respect to his supervised visitation objective, the court required Father to attend an introductory session with the Children and their developmental therapist, who saw the Children weekly. **See id**. The goal of this session, which occurred telephonically on December 12, 2022, was to teach Father about the Children's special needs. **See id**. at 82. Ms. Rybicki

reported that it was difficult to schedule the session because Father was slow to respond to her messages. ***See id***. at 83. Father had his first supervised visit with the Children on January 3, 2023, over one year after they were born. ***See id***. at 84.

Throughout the Children's dependency proceedings, Father largely failed to meaningfully address or comply with his court-ordered goals. Primarily, he never participated in a parenting program. ***See id***. at 99-100. Father insisted he did not need a parenting course because he is caring for five other children. ***See id***. Father also never participated in IPV counseling or mental health treatment, despite reporting to Ms. Rybicki that he suffers from anxiety and attention deficit hyperactivity disorder ("ADHD"). ***See id***. at 95, 107. Furthermore, Father never progressed beyond one two-hour supervised visit per week with the Children at the kinship mother's home. ***See id***. at 103-105. In fact, in November 2022, the court informed Father that he could request an increase in visitation upon his completion of six visits, but Father never did so. ***See id***.

Moreover, Father failed to involve himself in the Children's medical and therapeutic appointments, only attending two over the course of the Children's dependencies, despite the numerous appointments the Children required. ***See id***. at 102-103. According to Ms. Rybicki, Father refused to accept that the Children even have special needs. ***See id***. at 106. Finally, Father did not obtain appropriate housing for the Children until April 12, 2024, which was

approximately two weeks prior to the subject termination hearing. *See id*. at 93-94.

On July 11, 2023, CYF filed petitions seeking the involuntary termination of Father's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). The orphans' court conducted an evidentiary hearing on April 29, 2024.[4]

CYF presented the testimony of Eric Bernstein, Psy.D.;[5] Brie Zarotney, assistant director of transportation for a kinship foster care agency that was responsible for coordinating Father's visitation with the Children; Ms. Rybicki; and Danielle Morrison, court appointed special advocate ("CASA") program

_____

[4] Our Supreme Court has held that "appellate courts should engage in *sua sponte* review to determine if orphans' courts have appointed counsel to represent the legal interests of children in contested termination proceedings, in compliance with" 23 Pa.C.S.A. § 2313(a). *In re Adoption of K.M.G.*, 240 A.3d 1218, 1235 (Pa. 2020). Further, if the appointed legal interest counsel also serves as GAL, "appellate courts should review *sua sponte* whether the orphans' court made a determination" that the child's legal interests and best interests "did not conflict." *Id*.

Here, in compliance with Section 2313(a), the orphans' court appointed the Children's guardian *ad litem* from the dependency proceedings as their legal interest counsel and determined that "no conflict exists that would prevent KidsVoice from accepting this appointment." Order, 10/26/23; *see also K.M.G.*, 240 A.3d at 1236.

[5] The court admitted Dr. Bernstein as an expert in child and forensic psychology. *See* N.T., 4/29/24, at 7. He performed four individual evaluations of Father. The evaluations occurred in December 2022, May 2023, January 2024, and March 2024. *See id*. at 8-9. He further completed interactional evaluations of the Children with Father and the Children with the kinship mother. *See id*. at 20-23

director. CYF also admitted various exhibits in support of their termination petitions.[6] Father testified on his own behalf and offered the testimony of Kristen Costanzo, a babysitter Father has used for his other children; M.M., Father's sister; and J.M., Father's brother.

Dr. Bernstein testified that he had "concerns" about Father's ability to care for the Children. *See* N.T., 4/29/24, at 12. Specifically, Dr. Bernstein questioned whether Father understood the Children's needs and his capacity to meet those needs as Father had told Dr. Bernstein that "the [C]hildren had no [developmental] delays or health issues[.]". *See id*. at 15, 24-25. Dr. Bernstein was also concerned about Father's ability to protect the Children because he pled guilty to endangering the welfare of a child ("EWOC") in 2019, prior to the Children's birth, related to an incident involving Father's other children. *See id*. at 10-12, 41-42. Dr. Bernstein emphasized that the Children were currently the same age as their half-sibling at the time she was injured in the incident, as follows: "[T]he age did not escape me as it relates

---

[6] While the exhibits from this proceeding were not included with the certified record, given the nature of the instant appeal and the testimony presented, this omission does not hamper our review. We, however, pointedly remind counsel that appellants bear "the responsibility to make sure that the record forwarded to an appellate court contains those documents necessary to allow a complete and judicious assessment of the issues raised on appeal." *Commonwealth v. Wint*, 730 A.2d 965, 967 (Pa. Super. 1999) (citations and internal quotation marks omitted); *see also* Pa.R.A.P. 1921 Note ("Ultimate responsibility for a complete record rests with the party raising an issue that requires appellate court access to record materials.") (citation omitted).

to the developmental state, and their ability to not be able to protect themselves." *Id*. at 49.

Ms. Costanzo, the babysitter caring for the children at the time of the incident that led to Father pleading guilty to EWOC in 2019, provided some specifics regarding what happened. Ms. Costanzo has known Father for over twenty years and babysat for him occasionally when he was working. *See id*. at 216-217. She was the babysitter caring for three of Father's other children at his home when the injuries occurred. She reportedly left the children alone to prepare them a meal. *See id*. at 176, 248. She testified that two of the younger children, who were both approximately two years old at the time, were "roughhousing" which caused various injuries to one of them. *See id*. at 217. Specifically, the child had her hair ripped out, had bruises on both her cheeks, and lesions near her hips and upper thighs. *See id*. at 219. Ms. Costanzo stated that she did not observe the incident and did not know how the child lost chunks of her hair or how the bruises and lesions occurred on her body. *See id*. at 218-219. Ms. Costanzo also confirmed that Father was not present when the injuries occurred as he was at work. *See id*. at 217.

Ms. Rybicki testified that Father attended 45 supervised visits with the Children, during which he did not display the appropriate parenting abilities. *See id*. at 151, 154. Instead, she testified that there were repeated complaints that Father refused to change diapers, feed the Children, or recognize their needs. *See id*. Ms. Morrison averred that she regularly

informed Father of the Children's various appointments. *See id*. at 176. She also concluded that Father never developed an understanding of the Children's therapies or their specialized developmental needs. *See id*. at 179.

By orders filed on April 30, 2024, the orphans' court involuntarily terminated Father's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). The orphans' court provided its rationale for the orders on the record in open court at the conclusion of the termination hearing on April 29, 2024. *See id*. at 282-287.

Father timely filed notices of appeal and concise statements of error complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On July 19, 2024, this Court consolidated Father's appeals *sua sponte*. On August 8, 2024, the orphans' court filed Rule 1925(a) opinions analyzing Father's arguments regarding the Children.

On appeal, Father presents the following issues for review:

1. Did the orphans' court abuse its discretion and/or err as a matter of law in holding that CYF presented clear and convincing evidence that grounds exist for the involuntary termination of Father's parental rights to the Children under 23 Pa.C.S.A. § 2511(a)(2), (5), and (8)?

2. Did the orphans' court err in finding that CYF presented clear and convincing evidence that the involuntary termination of Father's parental rights to the Children meets their needs and welfare pursuant to 23 Pa.C.S.A. § 2511(b) and is in their best interests?

Father's Brief at 3.[7]

> Our standard of review in this context is well settled:
>
> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.
>
> An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.
>
> In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (internal citations and quotation marks omitted).

---

[7] The Children's GAL filed a brief in support of affirming the orders involuntarily terminating Father's parental rights.

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id*. at 830; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). This Court need only agree with the orphans' court's determination as to any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm termination. *See M.E.*, 283 A.3d at 830 (*citing In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*)).

Our analysis in this case will focus upon Section 2511(a)(2) and (b), which provide, as follows:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).[8]

In order to satisfy Section 2511(a)(2), the petitioning party must establish:  "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied."  *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021).  Grounds for termination pursuant to Section 2511(a)(2), however, "are not limited to

---

[8] By analyzing only Section 2511(a)(2), we draw no conclusions regarding the validity of the termination of Father's parental rights under Section 2511(a)(5) and (8), the other subsections by which the orphans' court involuntarily terminated Father's parental rights.  *See B.L.W.*, 843 A.2d at 384. Nevertheless, to the extent the orphans' court stated in its Rule 1925(a) opinion that it erred in involuntarily terminating Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(5) and (8), we emphasize that it is unclear that the holding in *In re C.S.*, 761 A.2d 1197 (Pa. Super. 2000) (*en banc*), would apply to the facts of this case.  *See id*. at 1200 (holding that termination under Sections 2511(a)(5) and (8) was inappropriate where the child "was never in [the father's] care [due to his incarceration] and, therefore, could not have been removed from his care").

affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id*. (*citing* **In re Z.P.**, 994 A.2d 1108, 1117 (Pa. Super. 2010)). Overall, we emphasize that "[p]arents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." **A.H.**, 247 A.3d at 443.

If the orphans' court concludes that adequate grounds for termination exist pursuant to Section 2511(a), the court must then turn to Section 2511(b), which requires that it "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b); *see also T.S.M.*, 71 A.3d at 267. Our Supreme Court has generally outlined this inquiry as follows:

> [C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.
>
> Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.
>
> Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The courts must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

- 13 -

*Interest of K.T.*, 296 A.3d 1085, 1105-06 (Pa. 2023) (cleaned up).

The High Court further explained that "[i]t is only a necessary and beneficial bond, after all, that should be maintained." *Id*. at 1109. Our Supreme Court also recognized that "case law indicates that bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." *Id*. The extent of the "bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010). It is within the province of the orphans' court to "consider the totality of the circumstances when performing a needs and welfare analysis." *M.E.*, 283 A.3d at 839.

This Court has clarified that it is "within the discretion of the orphans' court to prioritize the safety and security" of children "over their bonds with their parents." *Id*. We will not disturb such an assessment if the orphans' court's factual findings are supported by the record. *Id*.

In his first issue, Father argues that the orphans' court abused its discretion in terminating his parental rights pursuant to Section 2511(a)(2) because he "remedied many of the concerns that CYF had, and has shown both progress in other respects, along with a willingness to do whatever he needs to do to" reunify with the Children. Father's Brief at 19. Specifically, Father asserts that he has remedied CYF's concerns about obtaining an

- 14 -

appropriate residence for the Children.  ***See id***. at 15.  He similarly contends that he remedied IPV concerns because he was often the subject of the abuse, and he had since separated from his wife.  ***See id***.  Further, he contends he was not directly supervising his other children at the time of the incident that led to him pleading guilty to EWOC and the conviction does not establish habitual neglect or intentional abuse by Father.  ***See id***. at 16.  Father also asserts he has made progress in building a relationship with the Children that "should increase greatly as Father is provided greater visitation rights . . . ." ***Id***. at 14.

With respect to Father's claims, Ms. Rybicki confirmed that Father obtained suitable housing in April 2024.  ***See*** N.T., 4/29/24, at 93-94. Likewise, Dr. Bernstein testified that Father gets an "A plus" for entertaining the Children.  ***See id***. at 16-17.  Nevertheless, the orphans' court determined that Father's conduct warranted the termination of his parental rights pursuant to Section 2511(a)(2), as follows.

> The record is clear that throughout the [Children's] lives, Father has failed to remedy his unfitness as a parent.  During Father's supervised visits, CYF flagged many serious concerns about his ability to meet the Children's needs.  [***See*** N.T., 4/29/24, at 151]. Specifically, CYF mentioned they had concerns about Father not feeding the [Children], not changing their diapers, not picking up on their cues, and generally not attending to their needs. [***See id***.]
>
> Father has consistently refused to become a better parent to the [Children] despite many opportunities to do so.  In November 2022, CYF invited Father to ten different monthly family team conferences, and [F]ather only participated in three or four of them, and even then, only at CYF's prompting at the beginning of

- 15 -

each meeting. [*See id*. at 100-101]. The [Children's kinship mother] and Ms. Morrison invited Father to attend numerous medical appointments for the [Children] between July 2023 and April 2024. Father only elected to attend two of them. [*See id*. at 102-103, 176].

. . .

In November 2022, the court invited Father to increase the frequency of his visits with the [Children. *See id*. at 104]. Ms. Rybicki noted that if Father would have taken these court-offered opportunities to increase his visits, there is a likelihood the [Children] may have looked to him as someone who could meet their needs. [*See id*. at 154]. Ms. Morrison testified that she encouraged Father to attend the [Children's] numerous medical appointments. Father only showed up to two of these appointments. [*See id*. at 176-177]. Furthermore, Father has never taken responsibility for scheduling the Children's appointments and making sure their medical and therapeutic needs are being met. [*See id*. at 177-178].

. . .

[At] one of the [Children's] two medical appointments he did attend[,] Father let one of the [Children] play unsupervised with a surgical glove, which the child nearly choked on until [the kinship mother] took the glove away. [*See id*. at 185]. These incidents show that Father had many opportunities to show his fitness as a parent, and failed to follow through.

*Id.* at 15-16. The orphans' court also found relevant that Father initially refused to provide essential care to the Children when he denied paternity until it was formally established through testing. *See* Orphans' Court Opinion, 8/8/24, at 14. The court further emphasized that Father lacked adequate housing during the majority of the Children's dependencies, citing Ms. Morrison's testimony that she "found several pressing problems with Father's house, including . . . a potential gas leak, insufficient heating, and lack of

- 16 -

furnishings for [the Children.]" **See id**. at 15 (*citing* N.T., 4/29/24, at 187-191). We discern no abuse of discretion.

Regarding the first prong of Section 2511(a)(2), i.e., the repeated and continued incapacity, abuse, neglect or refusal, Father essentially paints himself as a victim of the system in that by no fault of his own CYF obtained custody of the Children. **See** Father's Brief at 21. Specifically, he contends that he did not refuse to be involved in the Children's lives upon their birth because he reasonably believed he was not their biological father based on Mother's initial assertion that he was not. **See id**. at 11-12. He also asserts he would have accepted the Children sooner had CYF pursued genetic testing earlier. **See id**. To the extent that Father contends that the "legal deck" was stacked against him, we find his contention unavailing.

Ms. Rybicki stated that Father initially refused to provide essential parental care to the Children when he denied that they were his progeny and told her that he wanted nothing to do with them in January 2022. **See** N.T., 4/29/24, at 76. Ultimately, although Father knew there was, at the very least, a chance he was the Children's father, he refused to acknowledge the Children as his own until it was confirmed via DNA testing in October 2022. **See id**. at 77-78, 257.

In this case, although Father eventually accepted that he was the Children's biological father at the end of 2022, Father continued to demonstrate his incapacity and refusal to parent the Children. Specifically,

CYF encouraged Father to attend the Children's appointments to learn about their special needs, but during the course of their dependency he only attended two. *See id*. at 176-177. Instead of attending their appointments and learning about their services, Father denied that the Children even have special needs. *See id*. at 106.

In addition, Ms. Zarotney testified that Father started supervised visitations with the Children in January 2023 once a week for two hours. *See id*. at 57. Of the sixty visits offered, Father attended forty-five and ten were cancelled due to factors outside of Father's control. *See id*. at 57-58. Ms. Rybicki confirmed that Father attended visits with the Children, but ultimately did not feed them, diaper them, or respond to their needs. *See id*.

Father argues that his failure to feed, diaper, and respond to the Children's needs was not due to his own incapacity or refusal, but because the visitations occurred in the kinship mother's home. *See* Father's Brief at 12-13. He further contends that parenting the Children in his own home would be a better gauge of his parenting skills than observing him in another home. *See id*. at 13. He concludes that the most salient evidence is that of Father's "actual parenting" of his other children. *See id*. at 13, 18-19 (*citing **In the Interest of S.K.L.R.***, 256 A.3d 1108, 1124 (Pa. 2021)). He posits that, although he may not be a "perfect father . . ., no efforts have been taken to terminate his parental rights with respect to" his other children." *See* Father's

Brief at 18. He argues that if past parenting history is relevant to show incapacity, it should also be utilized to display capacity. *See id*. at 19.

To the extent that Father argues that the orphans' court should have focused on evidence related to Father's care of his other children, his argument is unsuccessful. Father and his siblings testified briefly regarding his ability to parent his other children, of which, according to Father, two live with him full-time. *See* N.T., 4/29/24, at 222-235, 245-247. The orphans' court heard this evidence and opted to focus on Father's incapacity when it came to the Children, their significant special needs, and Father's continued lack of engagement with the Children. As related *supra*, it is within the sound discretion of the orphans' court to make credibility determinations and decide which facts are most salient. *See M.E.*, 283 A.3d at 829-30.

Regarding Father's argument that he would have better shown his parenting skills if visitations took place at his own home, CYF reported to Father that there were ongoing issues with regard to his residence so visitations could not occur there until April 2024, when he moved to a new residence a mere two and a half weeks prior to the termination hearing. *See* N.T., 4/29/24, at 93-94. Further, Father never requested additional or unsupervised visitations with the Children. *See id*. at 103-105. As related *supra*, the orphans' court informed Father in November 2022, that he could request increased visitation rights upon completion of six visits. Father never progressed beyond supervised visits once a week for two hours because he

failed to make a request to the court. Father had various opportunities to display his capacity to parent the Children, but he refused to do so.

The record also sustains that Father appears to lack the protective capacity to keep the Children safe. Although Father contends that he merely pled guilty to EWOC at the behest of his defense attorney, he also testified that he would continue to use the babysitter who was caring for his children at the time the incident occurred. *See* N.T., 4/29/24, at 248-249. Father also testified that his daughter "was not seriously injured" even though she had her hair ripped out, had bruises on both her cheeks, and lesions near her hips and upper thighs. *See id*. at 219, 248. He further stated that "children are children, can't really control them doing too much." *See id*.

Finally, Ms. Morrison testified that at the first medical appointment Father attended in the summer of 2023, Father made a balloon with a surgical glove and gave it to Ny.R. *See id*. at 185. The doctor informed Father that the child should not play with the glove as it is plastic and children often put things in their mouth. *See id*. Father ignored the doctor and Ny.R. put the glove in her mouth and the kinship mother had to take it from her. *See id*. Based upon the foregoing, we readily conclude that the orphans' court heard sufficient evidence to establish that Father suffers from repeated and continued incapacity as well as refusal to comply with his permanency requirements.

Turning to the second prong of Section 2511(a)(2), the record is clear that Father's repeated and continued incapacity and refusal have caused the Children to be without essential parental care, control, or subsistence. As related *supra*, Father rarely attended their medical appointments. Even at his visitations, he largely failed to display any parental skills. Father was absent from the Children's lives for approximately one year from when they were born, and continued to not provide parental care, control, or subsistence even after he accepted that he was the Children's father.

With respect to the third prong, that the conditions and causes of his incapacity or refusal cannot or will not be remedied, it is also clear that the record supports the orphans' court's findings. Primarily, Father refused to take a parenting course, engage in mental health therapy, or complete IPV counseling. ***See id***. at 95, 99-100, 107. Further, Dr. Bernstein questioned whether Father understood the Children's needs and his capacity to meet those needs as Father had told Dr. Bernstein that "the [C]hildren had no delays or health issues[.]" ***See id***. at 15, 24-25. Ms. Rybicki confirmed that Father does not believe that the Children have any special needs. ***See id***. at 106. Although Father visited and played with the Children, he failed to address the main issue of the case, his incapacity to parent the Children who have special needs, and nothing in the record indicates he will be able to remedy this issue.

Based on the foregoing, we discern no abuse of discretion by the orphans' court in terminating Father's parental rights pursuant to Section 2511(a)(2). The record demonstrates that Father's repeated and continued incapacity, as well as his refusal to recognize the Children's needs and to comply with his permanency objectives, has caused the Children to be without essential parental care, control, or subsistence necessary for the Children's physical and mental well-being, and the causes of his incapacity and refusal cannot or will not be remedied.

Having established that the court did not err in terminating Father's parental rights to the Children pursuant to Section 2511(a), we now turn to Father's argument regarding Section 2511(b). Father argues that the court abused its discretion in failing to consider the "long-term damage" the Children will suffer by being denied the opportunity to be raised by their natural father. *See* Father's Brief at 22. Father further asserts that although Dr. Bernstein testified that the Children may experience some distress if removed from the kinship mother, he did not opine whether the distress would be "anything more than temporary. . . ." *See id*. at 23.

The orphans' court reasoned as follows regarding Section 2511(b):

> [W]hile Father has made some strides in terms of playing and interacting with the [Children], the [Children] see him not as a parent, but as a playmate. This distinction is important because Pennsylvania courts have emphasized that the mere existence of an emotional bond does not preclude the termination of parental rights.

. . .

- 22 -

> Although Father has progressed in his interactions with the [Children], it's clear that the [Children] do not see him as a parent, and rely on [the kinship mother] to meet their parental needs. In other words, [while] Father does have a bond with the [Children], this is not a necessary and beneficial one under Pennsylvania law.
>
> . . .
>
> The Children have been cared for by the [kinship] mother [] for nearly their entire lives. The record is crystal clear that [the kinship mother] is providing excellent care for the [Children.] [The kinship mother] has been providing for the [Children's] educational, developmental, and psychological needs since they have been in her care, beginning with their release from the hospital after birth. [**See id**. at 33-34]. Dr. Bernstein noted in his evaluation of [the kinship mother] that she is engaging fully with the [Children], and that she is providing for all of their day-to-day care. [**Id**.] Dr. Bernstein concluded that separating the [Children] from [the kinship mother] and placing them elsewhere would distress and traumatize them. [**See id**. at 34-35].
>
> Ms. Rybicki testified based on her visits of [the kinship mother's] home that she provides a great environment for the [Children], her house is child-proofed, organized and is equipped with developmentally appropriate equipment, including highchairs, bedding, and video cameras. [**See id**. at 124-125]. Furthermore, the Children have bonded with [the kinship mother's] four-year-old daughter. [**Id**.] Ms. Rybicki concluded that [the kinship mother] "just has everything figured out of how to run [] things smoothly to meet [the Children's] needs." [**Id**.]

Orphans' Court Opinion, 8/8/24, at 16-17, 20. Furthermore, at the conclusion of the termination hearing, the court reasoned that "there's no detriment to the [C]hildren if [F]ather's rights [are] terminated because [the C]hildren's stability will be preserved." N.T., 4/29/24, at 286. We discern no error or abuse of discretion.

Although Father had an "emerging" bond with the Children, it was not a parental bond. Instead, Ms. Rybicki testified that the Children saw him as a mere playmate. *See id*. at 105, 150-151. As related *supra*, although he visited the Children, Ms. Rybicki testified that Father never provided for any of the Children's needs. *See id*. at 151-154. Dr. Bernstein confirmed that the Children do not rely on him to meet their needs and termination of Father's parental rights would not be detrimental. *See id*. at 30. Dr. Bernstein testified regarding Father's relationship with the Children, as follows:

> Q: Can you describe the relationship that you observed that had developed between the Children and Father?
>
> A: Essentially, all of Father's effort to connect with the Children is -- the interaction is predicated upon the degree of his investment, which is to say that in many ways he entertains them with playfulness, silliness, joviality, cheerfulness, things of that nature and creates a certain hyper level of activity. But I view that as a bit distinct from caretaking, and being informed of their daily needs, providing to the extent that he can within the limits of the supervised visits or their needs. I didn't see Father do much of the parenting per se as I did more of the play and the interaction keeping them essentially entertained.
>
> Q: Does there appear to be a necessary and beneficial relationship between the Children and Father?
>
> A: I did ultimately support the court changing the goal. And that recommendation is based on the Children's established bond with the kinship mother and emerging bond even with Father. And I think to an extent he fulfills an important playful component in the Children's lives, but I do not believe that the Children rely on him for the meeting of their needs, which is an important distinction to note.

*Id*. at 29-30 (cleaned up). Dr. Bernstein also explained that termination of Father's rights would not be detrimental to the Children because the kinship

mother provides them with the stability they need. ***See id***. at 30. As such, the court was well within its discretion to determine that the bond is not necessary and beneficial to the Children. ***See K.T.***, 296 A.3d at 1109.

The record evidence also clearly evinces that the kinship mother meets all of the Children's needs. Ms. Rybicki testified as follows regarding the Children's bond with the kinship mother: "She is basically the only caregiver that they have ever known. [T]hey're loving towards each other, they trust her, they expect her to meet their needs, they have a great environment. [S]he makes it look easy, three children, [] and she just [] has a system for everything." N.T., 4/29/24, at 123. Ms. Rybicki confirmed that the kinship mother is a pre-adoptive resource and that the kinship mother's four-year-old daughter acts as a big sister to the Children. ***See id***. at 124. Similarly, Dr. Bernstein emphasized the stability and security that the kinship mother provides the Children. ***See id***. at 30.

Based on the foregoing, the record evidence amply demonstrates that the termination of Father's parental rights will serve the developmental, physical, and emotional needs and welfare of the Children. Therefore, we discern no abuse of discretion by the court in terminating Father's parental rights pursuant to Section 2511(b).

Accordingly, we affirm the orders terminating Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2) and (b).

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: <u>1/31/2025</u>